

NUMBER 13-11-00299-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A.G.G., A.D.G., I.V, AND V.V., MINOR CHILDREN

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Benavides, and Perkes**
**Memorandum Opinion by Justice Benavides**

This appeal involves the termination of A.V.'s ("Mother") parental rights over A.G.G., A.D.G., I.V., and V.V.[1]  By two issues, Mother asserts that (1) the trial court abused its discretion in finding her appeal frivolous under former family code section

---

[1] To protect the privacy of the parties, we will use aliases throughout this opinion.  *See* TEX. R. APP. P. 9.8.

263.405(d)(3); and (2) insufficient evidence supports the jury's findings.    We affirm.

## I.    BACKGROUND

The Texas Department of Family and Protective Services ("the Department") brought this involuntary parental termination action against Mother following its investigation of alleged child abuse—specifically, starvation and malnourishment of I.V.

### A.    The Evidence at Trial

#### (1)    *I.V.'s Medical Condition and Testimony from Treating Doctors*[2]

On February 27, 2009, I.V., age 3, arrived at Christus Spohn Hospital's emergency room in Corpus Christi unresponsive, not breathing, and with a weak pulse rate of 30.    Attending physician Amalia Tinoco, M.D., aided by the triage staff, worked to resuscitate I.V. by intubating him and running intravenous fluids into his body.    As part of the resuscitation process, Dr. Tinoco ordered a "finger-stick" reading of I.V.'s blood to determine his glucose level.    The "finger-stick" reading was performed twice on I.V. and revealed a glucose level of 3 each time.    According to Dr. Tinoco, a glucose level of 3 is incompatible with life and likely to result in death if not immediately restored to normal levels.    A "normal" glucose reading for humans is between 60 and 110.    Dr. Tinoco admitted that a glucose level of 3 was a rare reading in her practice.    Dr. Tinoco described I.V.'s physical appearance that day as "totally emaciated, just like a little skeleton of skin and bone."    In more descriptive terms, Dr. Tinoco likened I.V.'s

---

[2] Shortly after I.V.'s hospitalization at Christus Spohn, the Department was alerted to I.V.'s condition.    On March 2, 2009, the Department filed a petition for protection, conservatorship, and termination of parental rights against Mother regarding I.V.    Subsequently, the Department was appointed temporary managing conservator of A.G.G., A.D.G., I.V., and V.V.

appearance to that of concentration camp prisoners from World War II. Dr. Tinoco medically opined that I.V. had been starved.

Once I.V.'s condition was stablized, Dr. Tinoco interviewed Mother. Mother told Dr. Tinoco that she had last fed I.V. a hamburger earlier that morning. Dr. Tinoco stated that based on I.V.'s diagnostic condition and physical appearance, she found Mother's statements "medically impossible."

After approximately two hours of emergency care, I.V. was transferred to the Driscoll Children's Hospital Child Abuse Resource and Evaluation (CARE) team under the direct supervision of Nancy Harper, M.D., a double board-certified pediatrician and child-abuse pediatrician.

Dr. Harper spoke directly to I.V. during her initial consultation, in which he told her that he had not eaten anything in the last forty-eight hours. I.V. stated that he could neither walk nor run but wanted to eat a cheeseburger. Dr. Harper also interviewed Mother about what I.V. had eaten the previous day. Mother stated that she fed I.V. three meals the day prior, including an afternoon snack. Dr. Harper took several photographs of I.V. in his hospital bed to document his condition. These photos were admitted into evidence at trial and depicted a withered child whose ribcage was prominent and whose skin was sagging from his buttocks. Dr. Harper testified that the photos were "descriptive of how wasted [I.V.] was and was consistent with severe malnutrition." Dr. Harper further indicated that I.V.'s appearance and condition was not consistent with his having eaten anything in the last forty-eight hours.

Dr. Harper and the Driscoll CARE team retrieved I.V.'s medical records from previous health care providers and used these records to compile a "growth curve" that

spanned I.V.'s life. According to Dr. Harper, as a young baby, I.V. was "quite chubby," and weighed in the 95th percentile for his age. Most of his life, I.V.'s documented weights were in the 95th percentile and showed good growth until just after he turned age two. At that point, I.V.'s weight gain slowed, and he stopped growing in height. Dr. Harper testified that these factors are indicative of a child who is failing to thrive, also called "chronic malnutrition" or "stunting," which causes the child to stop growing. Due to his malnutrition, Dr. Harper testified that I.V.'s "metabolic machinery" was at a point where it was no longer functioning properly.

During I.V.'s near-month-long stay at Driscoll, more than sixty different genetic, metabolic, and medical tests were performed on him by multiple subspecialists in the fields of gastroenterology, hematology, nutrition, and physical and occupational therapy to determine the cause of his starvation. After the battery of tests, Dr. Harper concluded that chronic malnutrition brought on I.V.'s condition.

According to Dr. Harper, I.V. developed other medical conditions and complications as a result of his chronic malnutrition. One process, called "catabolism," occurred where I.V.'s body was breaking down fat in his body to provide fuel for energy. Under this condition, once the body runs out of fat-fuel sources, it begins to break down protein in the muscle and fats from other organs such as the brain and liver. Medical imaging showed brain atrophy, or shrinkage, in I.V.'s skull caused by starvation. According to Dr. Harper, I.V.'s body was "consuming his organs," including his brain, for energy. Dr. Harper stated that lowered cognitive skills and hyperactivity disorder were the potential consequences of brain atrophy. The CARE team also worked to avoid "refeeding syndrome" caused by a sudden surge in insulin from feeding a starved

4

person. This syndrome causes cells to retain electrolytes and deprive the blood from receiving them. Therefore, the CARE team fed I.V. at a slow pace so that he would gain weight at a slower rate to avoid further complications. However, I.V.'s bone marrow had already gone into shock as a result of the refeeding syndrome, which led to his anemia and required several blood transfusions to treat.

Dr. Harper noted that I.V. progressed positively during his hospitalization, but still struggled with walking up stairs unassisted. Dr. Harper was later informed in follow-up visits that I.V. overcame these mobility obstacles with time. From his hospitalization in late February/early March 2009[3] to his follow up visit in December 2009, I.V. had gained "almost 26 pounds" and had grown four inches in height. Dr. Harper described I.V. during his last visit as "playful" and "active," and said that he could run, despite having "slightly small calves." Overall, Dr. Harper testified that he did "great."

Dr. Harper opined from a medical perspective that I.V. was tortured. She also expressed concern about his safety if placed back in the care of Mother and others who cared for him prior to his hospitalization. Dr. Harper stated during questioning that I.V.'s treatment was "one of the most egregious, severe cases" that she has seen in her career.

---

[3] I.V. was discharged from Driscoll hospital on March 24, 2009.

**(2)    *Mother's & M.Z.'s Testimony*[4]**

Mother testified that she was concerned in late 2007 that I.V. "ate too much" but denied that she was concerned that he was "too chunky" or "too heavy."   Medical records from late 2007 admitted into evidence from M&M Pediatrics—during Mother's temporary residence in Brownsville—indicated that Mother was concerned about I.V.'s constant hunger and weight gain.   Mother noticed, however, that I.V. was losing weight from February 2008 (when baby V.V. was born) until December 2008—two months prior to his ultimate hospitalization—when she took him to Driscoll Children's Hospital for an evaluation.   Mother recalled that during the visit at Driscoll, the attending physician remarked that I.V. looked like he was starving.   I.V. was treated and eventually discharged with "non-organic failure to thrive."   Mother was instructed in I.V.'s discharge paperwork to follow-up with his primary care physician in two to three days.

During all relevant times in this case, Mother was romantically involved with V.Z. Mother lived with V.Z. along with Mother's children and V.Z.'s mother, M.Z.   M.Z. testified that she advised Mother several times to take I.V. for follow-up visits following his December 2008 discharge.   M.Z. testified that leading up to I.V.'s second hospitalization, she noticed that he was thin, but he was still walking, talking, and eating. M.Z. remembered that on the morning of February 27, 2009, she was caring for the other

---

[4] At the time of the parental termination proceedings, Mother was in the custody of the Texas Department of Criminal Justice's Insitutional Division.   On July 14, 2010, she was found guilty in Nueces County for injury to a child, a first-degree felony, and was sentenced to thirty years' imprisonment.   *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2011).   Mother appealed her conviction, which was affirmed by this Court on April 5, 2012.   *See Villarreal v. State*, No. 13-10-00396, 2012 WL 1142885 (Tex. App.—Corpus Christi April 5, 2012, no pet.) (mem. op., not designated for publication).

children in her bedroom when Mother barged in, frantically holding I.V., "crying [hysterically]," and asking for help because something was wrong with him.   M.Z. called 911.   Shortly thereafter, V.Z.'s brother and his girlfriend arrived at the home.   In light of the situation and I.V.'s appearance, V.Z.'s brother rushed I.V. to the hospital in his own vehicle because he was concerned about the time it would take for the ambulance to arrive.

### (3)   *Professor Wayne Donald Duehn's Testimony*

The Department elicited testimony from Wayne Donald Duehn, Ph.D., professor emeritus at The University of Texas at Austin's School of Social Work.   Professor Duehn testified that, based on his review[5] of this case, I.V. was "most definitely" a victim of "severe childhood torture."   According to Professor Duehn, "child torture" is a term used to distinguish "unusual and cruel punishment abuse of children."   The acts must be premeditated, intentional, and continuous.   Based on his review of I.V.'s psychological evaluation and report, Professor Duehn concluded that I.V. was hurt and "terrorized."   During cross-examination, Professor Duehn admitted that his assessments and conclusions were based on his review of others' reports and not from one-on-one contact with the individuals involved in the underlying case.

Another theory advanced by Professor Duehn was that of "family scapegoating." According to the professor, "family scapegoating" relates to family dynamics in which

---

[5] In preparation for his psychological and social evaluation report and testimony, Professor Duehn reviewed the following materials:   (1) affidavits of removal of A.G.G., A.D.G., I.V., and V.V.; (2) Dr. Harper's medical report of "severe starvation and neglect of I.V."; (3) psychological evaluations of Mother and V.Z.; (4) transcripts of previous court proceedings; (5) treatment and progress notes of A.G.G., A.D.G., I.V., and V.V. by two licensed therapists; (6) lecture notes of Nancy Kellogg in a conference on the Prosecution of Child Abuse Cases on Starvation; and (7) scholarly articles on empathetic deficits in siblings of "severely scapegoated" children.

one member of the family is singled out to be *the* reason for all the problems, issues, and dysfunctions existing within the family. Professor Duehn testified that the scapegoat is seen as "being wicked, bad, demented, evil, different, [and] strange," and that person becomes "the focus and explanation for all the problems that may exist in the family." As a result, the victim is treated differently by their siblings because the siblings become numb toward the victim as a result of their own vicarious trauma. According to Professor Duehn's psychological and sociological evaluation admitted into the record, the siblings of a family's scapegoat also experience issues with empathy skills by becoming "emotionally numb" to relationships and emotional problems through their lives.

Professor Duehn found evidence of family scapegoating in I.V.'s siblings, A.G.G. and A.D.G., as they initially did not verbalize any concern regarding I.V.'s critical medical condition during their respective psychological evaluations. According to his review of the case, Professor Duehn identified I.V. as the family's scapegoat because no other children appeared to be starved. In situations of family scapegoating and child torture, Professor Duehn testified that clinical research indicates that a torturer is "not amenable to treatment." Therefore, Professor Duehn recommended that it was in the children's best interest to terminate Mother's parental rights to A.G.G., A.D.G, I.V., and V.V.

### (4) *Department Caseworker Stacey Jones's Testimony*

Stacey Jones was the Department's caseworker assigned to this case. Jones admitted that while family services were offered to Mother after the Department's initial involvement, reunification with her children was never the Department's primary goal. Further, Jones noted, that against the Department's recommendations, the trial court

8

ordered that the Department find family placements for A.G.G., A.D.G., and V.V. after they were removed from Mother's care.  Only one family (the "AZ family") qualified for Department placement after criminal background checks and prior Department histories disqualified other family members.  Placement with the AZ family, however, lasted for only three months due to the family's poor financial situation and potential relocation to San Antonio.  Jones noted that during A.G.G., A.D.G. and V.V.'s time with the AZ family, Mother visited with the children several times in violation of the trial court's no-contact order.

For a short period of time before the girls moved to their current foster home, they lived with foster mother N.G.  According to Jones, N.G. asked the Department to remove the girls from placement due to behavioral issues.  However, Jones testified that the girls were happy with their third and current foster home placement and sought adoption from this family.  Jones testified that A.G.G. and A.D.G. later admitted in interviews that they initially lied to investigators when they told them that I.V. was not starved.  In fact, A.G.G. and A.D.G. admitted that I.V. was starved by V.Z.  Jones testified that A.G.G. and A.D.G. said that they lied about I.V.'s starvation because they were afraid of Mother.  Both admitted that they also continue to experience nightmares about I.V.'s severe malnutrition.

Based on the children's therapists' and Professor Duehn's recommendations, I.V. was placed in a separate foster home because I.V. reacted in a terrified manner when he saw A.G.G. at the hospital on one occasion.[6]  I.V. has continued his foster care in the

---

[6] The Department noted, however, that it has always considered reuniting the siblings together,

9

same home he has been in since his discharge from Driscoll Hospital in March 2009. I.V.'s foster mother, A.M., testified that I.V. initially struggled after his discharge from the hospital. Specifically, A.M. noted that I.V. had difficulty falling asleep at night. A.M. testified that she would console him by holding, rocking, and singing him back to sleep. Eventually, I.V. progressed by gaining weight and playing at the park. According to A.M., "he just blossomed." Jones testified that A.M. expressed an interest in adopting I.V., and Jones did not anticipate any problems with the potential adoption.

Jones stated that termination of Mother's parental rights was in all of the children's best interests.

### (5) *CASA Kathy Thornberry's Testimony*

Court-appointed Special Advocate ("CASA") Kathy Thornberry testified that she had been involved with this case since its inception and had attended every court proceeding, except one, leading up to the trial. Thornberry testified that both foster families—which have both expressed interest in adopting the children—agreed to keep the children in contact with one another in the future. Thornberry also recommended that termination of Mother's parental rights was in the children's best interest.

### B. Trial and Post-Trial Proceedings

A Nueces County jury reached a unanimous verdict to terminate Mother's[7] parental rights over A.G.G., A.D.G., I.V., and V.V. after the five-day trial.[8]

---

with the guidance and input from the children's therapists, court-appointed special advocates, and court-appointed ad-litems.

[7] Parental rights were also terminated as to A.G., the adjudicated father of A.G.G. and A.D.G., who voluntarily relinquished his parental rights to A.G.G. and A.D.G. by a signed affidavit at the time of trial.

Following the trial court's order of termination, Mother filed a motion for new trial, *see* TEX. R. CIV. P. 329b(b), and a statement of points on appeal on grounds that the termination evidence was legally and factually insufficient to support the jury's termination findings under Texas Family Code section 161.001(1)–(2). *See* Acts 2001, 77th Leg., ch. 1090, § 9, 2001 TEX. SESS. LAW. SERV. 1090 (West 2001), *amended and repealed by* Act of May 19, 2011, 82d Leg., R.S., ch. 75 §§ 4, 5 2011 TEX. SESS. LAW SERV. (West 2011).

The trial court held a post-trial hearing and held that Mother's appeal lacked an arguable basis in law or fact and denied Mother's motion for new trial. This appeal ensued.

## II.      FRIVOLOUSNESS FINDING

By her first issue, Mother asserts that the trial court abused its discretion in finding her appeal frivolous.

## A.      Applicable Law and Standard of Review

Because the trial court's order of termination was signed prior to September 1, 2011, we will apply the pre-2011 version of family code section 263.405—applicable parts of which have since been amended or repealed by the Legislature. *See* Acts 2001, 77th Leg., ch. 1090, § 9, 2001 TEX. SESS. LAW. SERV. 1090 (West 2001), *amended*

---

Additionally, three individuals were the alleged potential father of I.V., and two of those three were also the alleged potential father of V.V. All were represented by counsel at trial, and each of the alleged potential father's parental rights was terminated by the trial court. None of the potential fathers' terminations are before us on this appeal.

[8] The jury found that Mother engaged in conduct under family code subsection 161.001(1)(D), (E), (L), (O), and (Q) and that termination of Mother's rights was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2011).

11

*and repealed by* Act of May 19, 2011, 82d Leg., R.S., ch. 75 §§ 4, 5, 2011 TEX. SESS. LAW SERV. (West 2011).

In a previous order from this Court, we abated the underlying appeal and ordered the trial court reporter to prepare and file a complete reporter's record, including all evidence admitted at the termination proceeding without advance payment by Mother. *See In re K.D.*, 202 S.W.3d 860, 866 (Tex. App.—Fort Worth 2006, no pet.) ("an appellate court has the authority to order the preparation of a free record of all of the evidence in a termination case when necessary to review a trial court's determination that an appeal raising a factual sufficiency complaint is frivolous"). Additionally, we instructed both parties to re-brief this Court—first, on the issue of whether this appeal is frivolous; and second, on the substantive merits of Mother's appeal. Under the pre-2011 construction of section 263.405(d), the scope of appellate review is limited to the frivolousness finding. *See In re J.L.*, No. 13-07-00345-CV, 2010 WL 746702, at *2 (Tex. App.—Corpus Christi March 4, 2010, no pet.) (mem. op.) (citing *In re K.D.*, 202 S.W.3d at 865).

Once an affected parent files a statement of appellate points under the pre-2011 version of family code section 263.405(d), the trial court is required to conduct a hearing to determine, among other things, whether the appeal is frivolous as provided by section 13.003(b) of the civil practices and remedies code. *See* Acts 2001, 77th Leg., ch. 1090, § 9, 2001 TEX. SESS. LAW. SERV. 1090 (amended and repealed 2011); TEX. CIV. PRAC. & REM. CODE ANN. § 13.003(b) (West 2002). An appeal is frivolous if there are no substantial questions for appellate review and when the appeal lacks "an arguable basis whether in law or in fact." *See In re J.L.*, 2010 WL 746702, at *2.

12

A trial court may order termination of parental rights upon finding by clear and convincing evidence that the parent has committed statutory violations enumerated in section 161.001(1)(A)–(T) of the family code, *see* TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2011); and that termination is in the best interest of the child, *see id.* § 161.001(2). The following non-exhaustive list is considered by courts in analyzing the best interests of a child: (1) desires of the child: (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of individuals seeking custody; (5) programs available to assist individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams* 544 S.W.2d 367, 372 (Tex. 1976); *W.B. v. Tex. Dep't. of Protective and Regulatory Serv.*, 82 S.W.3d 739, 742 (Tex. App.—Corpus Christi 2002, no pet.).

Due process requires the application of the clear and convincing evidence standard of proof in parental termination cases. *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002); *see* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.*, 96 S.W.3d at 264; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

In a legal sufficiency review:

> a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, the reviewing court must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* at 267. The inquiry must be one that asks whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* Therefore, if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

When a trial court conducts a frivolousness hearing on factual and legal sufficiency grounds, the trial court should apply the aforementioned standards of review. *In re K.D.*, 202 S.W.3d at 867–68. Accordingly, we review a trial court's determination that an appeal is frivolous for an abuse of discretion. *In re J.L.*, 2010 WL 746702, at *2. The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, or stated another way, whether its decision was arbitrary

14

or unreasonable. *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)).

**B.    Discussion**

In her statement of points on appeal, Mother asserted that the evidence was legally and factually insufficient to support the jury's finding that she:

(1) knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, *see* TEX. FAM. CODE ANN. § 161.001(1)(D);

(2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, *see id.* § 161.001(1)(E);

(3) failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, *see id.* § 161.001(1)(O);

(4) has been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code: penal code section 22.04 (injury to a child, elderly individual, or disabled individual), *see id.* § 161.001(1)(L); and

15

(5) knowingly engaged in criminal conduct that has resulted in the mother's conviction for an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition, *see id.* § 161.001(1)(Q); and

(6) that termination of the parent child relationship between [Mother] and [A.G.G., A.D.G., I.V., and V.V.] is in the children's best interest, *see id.* § 161.001(2).

Mother argues in her brief that the trial court abused its discretion for summarily finding that her appeal was frivolous without taking any new evidence at the post-trial hearing concerning the frivolousness of her appeal. We disagree. The relevant former statute required the trial court to hold a hearing within 30 days to determine whether (1) a new trial should be granted, (2) [Mother's] claim of indigency should be sustained, and (3) the appeal is frivolous under section 13.003(b) of the civil practice and remedies code. In this case, the trial court complied with each respective provision.

Our complete review of the record in this case shows that I.V. was near-death, severely starved, and suffering from malnutrition under Mother's care at the time he was presented at the Christus Spohn emergency room. Photos admitted into evidence corroborate the first-hand descriptions offered by Dr. Tinoco and Dr. Harper who treated I.V. shortly after his arrival at the hospital. Drs. Tinoco and Harper described I.V.'s physical appearance at the time of his hospitalization as "wasted" and likened his appearance to victims of the Nazi concentration camps of World War II. Dr. Tinoco also testified with reasonable medical certainty that I.V. was within moments of death, given that I.V.'s glucose level was at 3, and a medically normal level is between 60 and 110. Furthermore, any disputed testimony offered by Mother, or anyone else, that I.V. had

16

eaten within the last twenty-hours of his emergency room visit was refuted as "medically impossible." Dr. Harper, a double-board certified pediatrician and child abuse pediatrician, testified that I.V.'s condition was "one of the most egregious, severe cases" of child abuse she had witnessed in her career. After receiving medical care and being removed from Mother's care, I.V. slowly recovered, progressed, and has since "blossomed." Additionally, the evidence shows that I.V. was diagnosed with non-organic failure to thrive two months prior to his near-death experience. At that time, the treating doctor at Driscoll advised Mother to take I.V. to his primary care doctor two-to-three days after his discharge, but Mother did not, despite repeated suggestions from M.Z. to do so.

The evidence also indicates lasting emotional and psychological damage in the other children, who witnessed I.V.'s starvation. However, presently, all the children are in stable home environments awaiting adoptions. The evidence at trial further established that Mother was convicted on July 14, 2010 in Nueces County of injury to a child, a first-degree felony, and sentenced to thirty years' imprisonment with the Texas Department of Corrections, Institutional Division. See TEX. PENAL CODE ANN. § 22.04. At trial, Mother was incarcerated, awaiting her appeal. Mother's judgment of conviction was admitted into evidence without objection. During testimony, several references were made to Mother's criminal trial by several witnesses. Mother also gave testimony that she was convicted of injury to a child, and at the time of trial, she was incarcerated.

Considering the entire record, we cannot say that the trial court abused its discretion by concluding that the evidence is such that a reasonable trier of fact could have formed a firm belief or conviction that its finding that all allegations were true and

17

that Mother's evidentiary sufficiency challenges were frivolous. *See In re K.D.*, 202 S.W.3d at 868. Moreover, because we hold that the trial court did not abuse its discretion in finding Mother's appeal frivolous, we need not address her remaining issue on appeal. *See* TEX. R. APP. P. 47.1.

### III. CONCLUSION

The trial court's order of termination is affirmed.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the 3rd
day of January, 2013.

18